# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 22, 2018             Decided April 12, 2019

No. 17-5247

OCEANA, INC.,
APPELLANT

v.

WILBUR ROSS, IN HIS OFFICIAL CAPACITY AS SECRETARY OF
THE UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-01220)

———

*Lide E. Paterno* argued the cause for appellant. With him
on the briefs were *Pratik A. Shah*, *James E. Tysse*, *Stanley E.
Woodward Jr.*, and *Alexandra Harrison*.

*Avi Kupfer*, Attorney, U.S. Department of Justice, argued
the cause for appellees. With him on the brief were *Jeffrey H.
Wood*, Acting Assistant Attorney General, *Eric Grant*, Deputy
Assistant Attorney General, and *Andrew C. Mergen*, Attorney.

Before: TATEL, WILKINS, and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*:  When fishermen catch fish but do not sell or keep them for personal use, they harvest what is referred to as "bycatch."  Discarded fish might constitute fish of an "undesirable size, sex, or quality," or fish that "fishermen are required by regulation to discard whenever caught."  16 U.S.C. § 1802(2), (9), (38).  Because a significant portion of bycatch do not survive (although some may be returned to the water), the phenomenon of bycatch can have detrimental effects on the marine ecosystem.  50 C.F.R. § 600.350(b).  Accordingly, the Magnuson–Stevens Fishery Conservation and Management Act ("Magnuson–Stevens Act"), as amended by the Sustainable Fisheries Act ("Fisheries Act"), 16 U.S.C. § 1801 *et seq*., directs the National Marine Fisheries Service ("the Fisheries Service") and regional councils to establish methodologies for collecting and reporting bycatch data.

Plaintiff Oceana, Inc. challenges the Standardized Bycatch Reporting Methodology ("Reporting Methodology") adopted in 2015 by the Fisheries Service to track bycatch in fisheries in the Northeast region of the United States.  Oceana claims that the reporting methodology violates the Magnuson–Stevens Act and the Administrative Procedure Act ("APA").  Defendant Fisheries Service[1] and Oceana filed cross-motions for summary judgment.  The District Court entered summary judgment for the Fisheries Service, finding that the Reporting Methodology satisfies applicable law.  Oceana now appeals.  We affirm the District Court because the Fisheries Service has met its obligation under the Fisheries Act to establish a standardized methodology.  We further conclude that the District Court did not abuse its discretion in not requiring that

---

[1] Defendants and Appellees in this suit include the Fisheries Service, a branch of the National Oceanic and Atmospheric Administration ("NOAA") in the Department of Commerce, the Secretary of Commerce, and NOAA itself, but we refer only to the Fisheries Service for simplicity.

the agency produce or include on a privilege log documents covered by the deliberative-process privilege.

**I.**

**A.**

In 1976, Congress adopted the Magnuson–Stevens Act to, among other things, "conserve and manage the fishery resources found off the coasts of the United States." 16 U.S.C. § 1801(b)(1) (2000). Under this act, the Fisheries Service and eight regional councils are tasked with developing Fishery Management Plans, which the Secretary of Commerce may approve after public notice and comment. 16 U.S.C. §§ 1853(c), 1854(a). The Secretary then promulgates final regulations to implement the Fishery Management Plan. 16 U.S.C. § 1854(b).

The Magnuson–Stevens Act, as amended by the Fisheries Act, provides that, "to the extent practicable," Fishery Management Plans must minimize bycatch. 16 U.S.C. § 1851(a)(9). The Magnuson–Stevens Act defines bycatch as "fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic discards and regulatory discards." 16 U.S.C. § 1802(2). Minimizing bycatch is important because "[b]ycatch can . . . impede efforts to protect marine ecosystems and achieve sustainable fisheries and the full benefits they can provide to the Nation." 50 C.F.R. § 600.350(b). Bycatch may not only "preclude other more productive uses of fishery resources," but also "increase substantially the uncertainty concerning total fishing-related mortality." *Id*.

Under the Fisheries Act, Fishery Management Plans must "establish a standardized reporting methodology to assess the

amount and type of bycatch." 16 U.S.C. § 1853(a)(11). Pursuant to § 1851(a)(2), "[c]onservation and management measures shall be based upon the best scientific information available."

**B.**

In 2008, the Fisheries Service promulgated an omnibus amendment to the Fishery Management Plans covering the Northeast region. *See* 73 Fed. Reg. 4736 (Jan. 28, 2008) (the "2008 Amendment"). The 2008 Amendment outlined a methodology that would allocate bycatch observers to more than fifty "fishing modes." With enough observers, the Fisheries Service reasoned, the bycatch rates would be statistically reliable. *Oceana, Inc. v. Locke*, 670 F.3d 1238, 1239 (D.C. Cir. 2011). The 2008 Amendment also authorized the Fisheries Service to invoke a "prioritization process" to depart from its allocation rule whenever "external operational constraints would prevent [the Fisheries Service] from fully implementing the required [] observer coverage levels." *Id*. at 1240.

Oceana filed a lawsuit alleging that the 2008 Amendment did not establish a standardized methodology "because it create[d] a 'loophole' that allow[ed] the [Fisheries Service] Regional Administrator to avoid applying the minimum acceptable level of observer coverage under the [Reporting Methodology] in any year 'in which external operational constraints would prevent [Fisheries Service] from fully implementing the required at-sea observer coverage levels.'" *Oceana, Inc. v. Locke*, 725 F. Supp. 2d 46, 54 (D.D.C. 2010). Such an external constraint could be due to "funding shortfalls," *id*. at 55; but notably, the Fisheries Service determined both the amount of funding required for bycatch observation and the funding it would allocate for that purpose,

*Locke*, 670 F.3d at 1242. In *Oceana, Inc. v. Locke*, the District Court upheld the 2008 Amendment, *see* 725 F. Supp. 2d at 72, but we reversed, *Locke*, 670 F.3d at 1243. We held that "[b]ecause the [2008] Amendment grants the Fisheries Service substantial discretion both to invoke and to make allocations according to a non-standardized procedure . . . the Service did not 'establish' a standardized methodology under the Fisheries Act." *Locke*, 670 F.3d at 1243. This Court directed the District Court to vacate the 2008 Amendment and remand it to the agency. *Id*.

## C.

In response to this Court's remand of the 2008 Amendment, the Fisheries Service promulgated the Reporting Methodology at issue in this appeal. 80 Fed. Reg. 37182 (June 30, 2015). To obtain data on the number of discarded fish (bycatch) in a fishery, the Fisheries Service uses the Northeast Fisheries Observer Program, which places an at-sea observer in vessels that are permitted to participate in federal fisheries. 80 Fed. Reg. 37183. According to the Reporting Methodology, these observers "are generally biologists trained to collect information onboard fishing vessels." J.A. 596. They are instructed to record all catch and bycatch caught in the net and identify them to "the lowest taxonomic level possible." J.A. 596-97. Because it would be too expensive and infeasible to place a human observer on all the vessels in the Northeast fisheries at all times, the Fisheries Service places observers on only a sample of fishing trip vessels. This sampling process employs a statistical design that allocates observers to vessels so as to reduce bias and obtain a sufficiently precise bycatch estimate. In turn, the Fisheries Service can extrapolate the sample data to the entire fleet.

Oceana filed a complaint in District Court for a declaration that the Reporting Methodology violates federal law, including the Fisheries Act and the APA. The complaint alleged that the Reporting Methodology did not establish a standardized reporting methodology for bycatch, in that the 2015 Amendment permitted adaptation to available funding. Oceana further argued that the formula for calculating the target number of observer trips should have been based on species that are not only federally but also non-federally managed.

In the District Court, the Fisheries Service filed an administrative record. The filing included an index of withheld privileged documents, classifying the documents as withheld because of Attorney-Client Privilege, Attorney Work Product, Deliberative Process Privilege, or Non-Responsive. The Fisheries Service later supplemented its administrative record with eight additional documents and supplemented its filing with a revised index of privileged documents. Oceana moved to compel the Fisheries Service to "conduct a complete review of its agency files, including email correspondence" and "to includ[e] all such responsive documents from that search." *Oceana, Inc. v. Pritzker*, 217 F. Supp. 3d 310, 315 (D.D.C. 2016) (citations omitted). The District Court denied Oceana's motion and subsequently granted the Fisheries Service's motion for summary judgment. Oceana appeals both rulings.

## II.

We review "not the judgment of the district court but the agency's action directly, giving 'no particular deference' to the district court's view of the law." *Locke*, 670 F.3d at 1240 (quoting *Nat. Res. Defense Council v. Daley*, 209 F.3d 747, 752 (D.C. Cir. 2000)). However, we will defer to the Fisheries Service's interpretation of what the Fisheries Act requires, provided it is "rational and supported by the record." *C & W*

*Fish Co. v. Fox*, 931 F.2d 1556, 1562 (D.C. Cir. 1991). The Fisheries Service's methodology must be "based upon the best scientific information available," 16 U.S.C. § 1851(a)(2), and cannot be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A).

**A.**

Oceana contends the Fisheries Service has not "established a standardized reporting methodology to assess the amount and type of bycatch occurring in fisher[ies]" as required by the Fisheries Act. 16 U.S.C. § 1853(a)(11). Specifically, Oceana argues that the Reporting Methodology permits the Fisheries Service to depart from its observer allocation methodology whenever it decides to dedicate insufficient funds. Appellant's Br. 15. We disagree.

In *Locke*, this Court found problematic that the 2008 Amendment afforded the Fisheries Service "complete discretion to determine when an 'external operational constraint prevents it from fully implementing the required coverage levels.'" *Locke*, 670 F.3d at 1241 (quoting 73 Fed. Reg. at 4738). Following the 2015 revisions, the Fisheries Service no longer enjoys such discretion. Rather than establish required at-sea coverage levels, the Reporting Methodology calculates coverage levels according to a prioritization process. As a baseline, the Reporting Methodology first calculates the number of observation days in each fishing mode needed to achieve a bycatch estimate within a coefficient of variation ("CV")[2] of 30 percent for each of fifteen, federally-managed

---

[2] The Reporting Methodology uses a precision measure called the CV, "calculated as the ratio of the square root of the variance of the bycatch estimate . . . to the bycatch estimate itself." J.A. 624 n. 27. The lower the CV is, the less variance in the sample, and thus the more precise the estimate. The Reporting Methodology provides

species groups.  J.A. 625.  The Reporting Methodology then adjusts its observation-day estimate.  The methodology uses a so-called "importance filter," when it compels a "high [number of] observer sea day coverage levels, in spite of the fact that the actual magnitude in frequency of discards may be low and of small consequence to the discarded species."  J.A. 694.  Another adjustment, which Oceana challenges, modifies the initial observer coverage level based on the availability of funding.  Importantly, the funding adjustment is a "non-discretionary formulaic process[]."  80 Fed. Reg. at 37,184.

That the Reporting Methodology accounts for available funding does not prevent it from being "established" for the purposes of the Fisheries Act.  *See* 16 U.S.C. § 1853(a)(11).  Congress did not instruct that a "standardized reporting methodology" must be constant across all possible funding scenarios.  Rather, the Fisheries Service adopts a rational interpretation of the Act by establishing a dynamic but non-discretionary methodology.  We are not positioned to assuage Oceana's concern that the Fisheries Service could insufficiently allocate funds to execute the Reporting Methodology because "the allocation of funds from a lump-sum appropriation is [an] administrative decision traditionally regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993); *see also Int'l Union v. Donovan*, 746 F.2d 855, 862-63 (D.C. Cir. 1984).  Congress has not instructed the Fisheries Service to fund its program for implementing 16 U.S.C. § 1853(a)(11) at a specific or minimum level.  Instead, the Fisheries Service must establish a standardized reporting methodology that fulfills its obligations to track bycatch in fisheries in the Northeast United States regardless of its

---

guidance on calculating the number of fishing days that should be observed in order to ensure that the CV of the bycatch estimate will not exceed a certain threshold.

funding allocation decisions. It has done so; regardless of how much funding the Fisheries Service apportions to the Reporting Methodology program, it will apply a standardized reporting methodology as prescribed by the statute.

Because the Fisheries Service does not have discretion to depart from the Reporting Methodology based on funding, it is under no obligation to "adequately define the circumstances that trigger [any] case-by-case analysis." *Locke*, 670 F.3d at 1241 (citing *Cement Kiln Recycling Coalition v. EPA*, 493 F.3d 207, 220-23 (D.C. Cir. 2007)).

**B.**

In its initial calculations, the Reporting Methodology allocates at-sea observers based on the number of days needed to achieve a 30 percent CV for federally managed species, which accounted for 82.8 percent, by weight, of observed discards in 2012. This initial calculation is not based on non-federally managed species. However, the Reporting Methodology collects data on non-federally managed species, because "*all* species (managed and non-managed) encountered by observed fishing vessels are reported either as landings or discards." J.A. 724 (emphasis added).

Oceana argues that the Fisheries Service's exclusion of non-federally managed species from the prescribed process for determining observer coverage level prevent the Reporting Methodology from being "standardized," in violation of 16 U.S.C. § 1853(a)(11). Oceana argues that Congress intended for the term "bycatch" to include non-federally managed species; bycatch is defined as "fish which are harvested in a fishery, but which are not sold or kept for personal use," *id*. § 1802(2), and fish is defined as "finfish, mollusks, crustaceans, and all other forms of marine animal and plant life other than

marine mammals and birds," *id*. § 1802(12). The Fisheries Service does not dispute that the definition of 'bycatch' encompasses non-federally managed species but notes that § 1853(a)(11) contains no requirements governing the *contents* of the standardized reporting methodology. We agree.

Congress directs the Fisheries Service to "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery." *Id.* § 1853(a)(11). We need not, as Oceana would like, interpret the statute's use of the word "standardized" to require that the Fisheries Service consider all bycatch species, rather than a subset thereof, in determining observer assignments. "[S]tandardized" modifies "reporting methodology" not "amount and type of bycatch." *See* Appellee's Br. 27-28 (citing ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 152-53 (2012) (describing the syntactic canon of construction that a prepositive modifier applies to the nearest referent)). The Reporting Methodology's mathematical formula for assigning observers and uniform recording protocols fulfills the statute's standardization requirement. In any event, the Fisheries Service's methodology is consistent with the understanding that "bycatch" includes non-federally managed species. That the Reporting Methodology requires at-sea observers to collect data on *all* bycatch observed means the methodology assesses bycatch of *all* species. Accordingly, the agency's decision to consider only federally managed species when allocating at-sea observers reflects a permissible reading of the governing statutory text.

## C.

Oceana believes the Fisheries Service, in developing its Reporting Methodology, had an obligation to reconsider alternatives it "considered and rejected" in developing the 2008

Amendment. Because the Fisheries Service limited the scope of its development to the Court's remand instructions, Oceana argues that "the Service based its decision to forgo the use of electronic monitoring technology on an outdated and inaccurate understanding of the capabilities and costs of the technology." Appellant's Br. 16. To do so, Oceana argues, violates the APA and the Fisheries Act. Neither argument has merit.

Oceana contends that it was arbitrary and capricious for the Fisheries Service to exclude the use of electronic monitoring (video cameras) from its Reporting Methodology. Under the proper standard of review, this Court is "highly deferential" to the agency's decision and presumes that the agency action is valid. *See Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976) (en banc) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971)). Nonetheless, we are not a "rubber stamp," and we must ensure that the agency considered all of the relevant factors. *Id.*

In implementing a Reporting Methodology consistent with the statutory demands of the FSA, the Fisheries Service decided to make use of at-sea observers rather than electronic monitoring. In response to comments received during the notice-and-comment period, the Fisheries Service explained why it made this decision. The Fisheries Service described issues with the affordability of electronic monitoring. 80 Fed. Reg. 37,182, 37,191. The agency also noted that, in some scenarios, "electronic monitoring is not yet considered robust enough to replace observers for bycatch monitoring."[3] *Id.* The

---

[3] The Fisheries Service explains:

a technology [electronic monitoring] that is suitable for identification of bycatch of a distinctive species by a specific gear type, such as bluefin tuna in the pelagic longline fishery,

Reporting Methodology elaborated on these shortcomings. Unlike at-sea observers, "electronic monitoring is currently capable of acquiring only simple presence and absence data rather than [] highly detailed data." J.A. 613-14.

The Fisheries Service's explanation for why it chose not to include electronic monitoring in its Reporting Methodology is sufficient to pass "arbitrary and capricious" review. Oceana insists that these explanations are improperly grounded in pre-2008 information. While the Fisheries Service could not ignore important evidence that was developed between 2008 and 2015, it is not prohibited from relying on information it used in 2008 when it promulgated an earlier version of this rule. Instead, Oceana must prove that the Fisheries Service "offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Insurance. Co.*, 463 U.S. 29, 43 (1983). Oceana has not proven such.

Oceana's briefing points only to one 2009 study that the Fisheries Service "never cited," which allegedly shows "that incorporating electronic monitoring technology under certain conditions could be cheaper than exclusively using observers." Appellant's Br. 45. It does not appear that Oceana cited this study in its 2013 comments to the proposed rule. J.A. 874-87. In fact, the Fisheries Service contends that "none of Oceana's

---

may not yet be as suitable or affordable for monitoring more complex bycatch situations covered by the [Reporting Methodology], such as differentiating flounder species in a multispecies trawl fishery, or providing length and weight data (all of which would be essential for electronic monitoring to effectively replace observers under the [Reporting Methodology]).

80 Fed. Reg. 37,182, 37,190.

comments on the 2015 Amendment or its implementing regulations mentioned the 2009 study." Appellee's Br. 35. We have long recognized that "a party must initially present its comments to the agency during the rulemaking in order for the court to consider the issue." *Appalachian Power Co. v. E.P.A.*, 251 F.3d 1026, 1036 (D.C. Cir. 2001). Accordingly, the Fisheries Service had no obligation to address the study.

Additionally, the Fisheries Service did not fail to utilize the "best scientific information available" when it excluded the use of video cameras from its Reporting Methodology. The Fisheries Service explains that the 2009 findings neither are relevant nor provide the agency with superior scientific information. Appellee's Br. 35-36. The study does not alleviate the agency's fundamental critique of electronic monitoring – the methodology is not "capable of executing the vastly 'more complex' task of 'assess[ing] the amount and type' of bycatch by identifying, differentiating and collecting biological information on hundreds of discarded species." *Id.* at 36. In this case, the Court has a "particularly strong" rationale for deferring to the agency: "In an area characterized by scientific and technological uncertainty, [we] must proceed with particular caution, avoiding all temptation to direct the agency in a choice between rational alternatives." *American Wildlands v. Kempthorne,* 530 F.3d 991, 1000 (D.C. Cir. 2008).

## III.

Oceana contends that the District Court abused its discretion in denying Oceana's motion to compel. A district court abuses its discretion when it "makes an error of law." *In re Sealed Case (Med. Records)*, 381 F.3d 1205, 1211 (D.C. Cir. 2004). Accordingly, the "abuse-of-discretion standard includes review to determine that the discretion was not guided

by erroneous legal conclusions." *Id.* (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)). Oceana argues that it was an error of law for the District Court to hold that the agency's documents were protected by the deliberative-process privilege and to allow the Fisheries Service to exclude the deliberative documents from the privilege log. We find that there was no such error of law.

Oceana's argument relies on the proposition that this is not a "routine APA case" involving the familiar arbitrary and capricious standard of review. Appellant Br. 56 (quoting *District Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56 (D.C. Cir. 2015)). Rather, Oceana argues, we ought apply a more stringent standard that considers whether the Fisheries Service used the "best scientific information available." *Id.* Given this standard, Oceana believes they are entitled to any "internal documents that bear on the agency's consideration of scientific information." *Id.*

Both the Fisheries Act and our prior decision in this case confirm that we must employ the routine APA standard of review. The judicial review provision of the Fisheries Act provides that Chapter 7 of Title 5 of the United States Code — the APA — governs our review. *See* 16 U.S.C. § 1855(f). The Fisheries Act specifically commands that we "only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of [Title 5]." *Id.* Unsurprisingly, we applied the customary arbitrary and capricious standard when reviewing the 2008 Amendment in *Locke*, 670 F.3d at 1240 (citing 5 U.S.C. § 706(2)(A) and 16 U.S.C.§ 1855(f)), just as we did in an unrelated matter involving the Endangered Species Act, a statute that similarly mandates use of the "best . . . data available," *Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 (D.C. Cir. 2012) (quoting 16 U.S.C. § 1533(b)(1)(A), and (2)). What that means is that rather than reviewing whether

15

the agency "examine[d] the *relevant data* and articulate[d] a satisfactory explanation for its action," *State Farm,* 463 U.S. at 43 (emphasis added), we review whether the agency examined the *best available data* and articulated a satisfactory explanation for its action. Yet, this is still arbitrary and capricious review and we conduct that review based upon the record before the agency. *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015) ("Whether an agency has arbitrarily used deficient data depends on the specific facts of a particular case, as 'the parameters of the arbitrary and capricious standard of review will vary with the context of the case.'") (quoting *WWHT, Inc. v. FCC,* 656 F.2d 807, 817 (D.C. Cir. 1981)); *see also id.* at 54.

We also find that the District Court did not abuse its discretion by declining to require that the Fisheries Service include on a privilege log those documents that the agency excluded from the administrative record because they were deemed predecisional and deliberative. The District Court correctly observed that "predecisional and deliberative documents 'are not part of the administrative record to begin with,' so they 'do not need to be logged as withheld from the administrative record.'" J.A. 18 (citing *Oceana, Inc. v. Locke*, 634 F. Supp. 2d 49, 52 (D.D.C. 2009), *rev'd on other grounds*, 670 F.3d 1238 (D.C. Cir. 2011)). As we have held, on arbitrary and capricious review, absent a showing of bad faith or improper behavior, "[a]gency deliberations not part of the record are deemed immaterial." *In re Subpoena Duces Tecum*, 156 F.3d 1279, 1279, 1280 (D.C. Cir. 1998). Because predecisional documents are "immaterial," they are not "discoverable." Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter *that is relevant* to any party's claims or defense . . . ." (emphasis added)). A privilege log is required only when "a party withholds information otherwise discoverable by claiming that the

information is privileged," Fed. R. Civ. P. 26(b)(5), and since predecisional documents are irrelevant and therefore not "otherwise discoverable," they are not required to be placed on a privilege log.

The fact that the agency could also assert the deliberative process privilege over such predecisional documents does not change the analysis. Rather than submitting a privilege log, on APA review, the agency must submit "[p]roper certification" that the record is complete, which serves as "formal representation by the [agency]" that it duly evaluated all predecisional documents before excluding them from the record. *Norris & Hirshberg v. Securities and Exchange Commission*, 163 F.2d 689, 694 (D.C. Cir. 1947). The federal rules do not require parties to provide logs of all documents that were not produced because they were deemed immaterial or irrelevant. It would be quite odd to require a different procedure in agency review cases, particularly since "the designation of the Administrative Record, like any established administrative procedure, is entitled to a presumption of administrative regularity." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993) (citing *Wilson v. Hodel,* 758 F.2d 1369, 1374 (10th Cir. 1985)). This is not an instance where a redacted document was placed in the administrative record and there was a credible showing that the redactions may have obscured "factual information not otherwise in the record," *National Courier Ass'n v. Board of Governors*, 516 F.2d 1229, 1242 (D.C. Cir. 1975), or where the agency improperly supplemented the record with "post hoc rationalizations" supporting its actions, *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984), or where a "substantial showing" was made that the record was incomplete, *Nat. Res. Def. Council, Inc. v. Train*, 519 F.2d 287, 291 (D.C. Cir. 1975). These situations would justify further action or inquiry by the District Court. Here, Oceana made no

substantial claim of such special circumstances, and its abuse of discretion challenge accordingly fails.

\* \* \*

For the foregoing reasons, we affirm the judgment of the District Court.

*So ordered.*